PARTOLA MFG. CO. v. NORFOLK & W. RY. CO.

(District Court, S. D. New York.    July 2, 1918.)

1. REMOVAL OF CAUSES ⊂⊃112—EFFECT—OBJECTIONS TO JURISDICTION.

   All jurisdictional objections may be made after removal to the federal court of a cause begun in the state court.

2. CORPORATIONS ⊂⊃642(1)—FOREIGN CORPORATIONS—"DOING BUSINESS" IN STATE.

   A foreign corporation which had formerly maintained an office in New York where it solicited business cannot be deemed "doing business" in that state during the period when it was dismantling the office and preparing to abandon the same, pursuant to order of the United States Director General of Railroads.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Doing Business.]

3. CORPORATIONS ⊂⊃642(4½)—FOREIGN CORPORATIONS—"DOING BUSINESS" IN STATE.

   Where a Virginia railroad company which maintained no lines in New York solicited passenger and freight business in New York, it was not thereby "doing business," as the solicitors merely sought to obtain business, received no money for freight, and issued no tickets for transportation of passengers; hence service of process on one of the company's New York solicitors would not give the New York court jurisdiction.

At Law.    Action by the Partola Manufacturing Company against the Norfolk & Western Railway Company, begun in state court and removed to the federal court.    On motion to set aside service of summons for want of jurisdiction.    Motion granted.

The action is at law to recover $3,511.01 brought against defendant by the transferee of a bill of lading calling for delivery at New York City of a shipment of caustic soda consigned from Saltville, Va., and alleged never to have been delivered.

The summons and complaint were served April 25, 1918, upon Samuel M. Stevenson, general Eastern agent of defendant company at No. 299 Broadway, New York City.

Defendant has no railroad in the state of New York and has never made application for authority to do business as a foreign corporation in New York nor designated any person for service there, under section 18 of the General Corporation Law of New York.

As the question here presented may come up from time to time, I shall, for the convenience of counsel, quote somewhat fully from Mr. Stevenson's affidavit so as to save counsel, having similar cases, the trouble of examining the original papers on file.

Mr. Stevenson states as follows:

"The plaintiff above named delivered to me copies of the summons and complaint in this action on the 25th day of April, 1918.    At that time I was employed as 'manager' of an association of railway and steamship companies known as the Virginia, Tennessee & Georgia Air Line, and also known as the 'Fast Freight Line.'    The facts in regard to this association are, briefly, as follows:

"The members of the association are: Clyde Steamship Company, Baltimore Steam Packet Company, New York, Philadelphia & Norfolk Railway Company, Merchants' & Miners' Transportation Company, Norfolk & Western Railway Company, and Old Dominion Steamship Company.    The association formerly maintained an office at No. 299 Broadway, New York City.    This office consisted of six rooms.    On the door of the office there appeared the following: 'Norfolk & Western Railway Lines, Virginia, Tennessee & Georgia Air Line, Old

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Dominion Steamship Company, Cumberland Gap Despatch, Norfolk & Western Despatch.' The association had on its pay roll in this New York City office nineteen persons: Fourteen men and five women. The work of the office consisted entirely in soliciting orders for the carriage of freight in interstate commerce over two or more connecting lines of the association and arranging for the shipment of the same. A transaction typical of the work carried on would be as follows: An order would be obtained for the carriage of freight from New York City to some point in Virginia; the association would bill the goods for shipment from New York on the Old Dominion Steamship Company line to Roanoke, or some other Virginia port, there to be transferred to the Norfolk & Western Railway Company and sent over its line to the point of destination. All moneys for the carriage of freight were received by the carriers themselves and were the charges published by the several carriers as required by section 6 of the act of Congress known as the act to regulate commerce. No funds collected for the carriage of freight were handled by the association, and the only funds of the association carried in the New York office were moneys to be used in paying the salaries of the employés and the office charges. These funds were kept in a bank account in the name of the Virginia, Tennessee & Georgia Air Line, and not in the name of any of the members of the association. My duties as manager of the New York office of the association consisted in the general supervision of the work of soliciting orders for the carriage of freight and arranging for the shipment of the same as outlined above. Practically my entire time was occupied in Virginia, Tennessee & Georgia Air Line Association work.

"On said 25th day of April, 1918, I was also employed independently by the Norfolk & Western Railway Company as general Eastern agent. The Norfolk & Western Railway Company is a corporation organized and existing under and by virtue of the laws of the state of Virginia, and not elsewhere, and has its principal office in the city of Roanoke in the county of Roanoke, in said state of Virginia. Its line of railroad extends through or into the states of Virginia, West Virginia, Maryland, North Carolina, Kentucky, and Ohio, and not elsewhere. No part of its said line of railroad is now or ever has been located within the state of New York, and it operates no engines or cars within the said state. Freight moving over its said line of railroad to a destination within the state of New York enters said state on railroad lines which are owned and operated by other railroad companies. While any car owned by said Norfolk & Western Railway Company is being used or operated by such other railroad company within the state of New York, such other railroad company pays to said Norfolk & Western Railway Company a per diem charge or rental for the use of such car, and such car while within the state of New York is operated exclusively by the carrier upon whose line of railroad it is, and all of the freight moneys earned by said car in the said state are retained by the carrier there operating such car, and no part of such freight charges is paid to the Norfolk & Western Railway Company. The eastern terminus of the Norfolk & Western Railway Company's said line of railroad is Norfolk, Va. Its western termini are Cincinnati and Columbus, Ohio. Its northern terminus is Hagerstown, Md. Its southwestern termini are Bristol and Norton, Va., and its southern termini are Winston-Salem and Durham, N. C. The business of said Norfolk & Western Railway Company is and always has been merely the transportation of freight and passengers over its said line of railroad which is and always has been located entirely outside of the said state of New York.

"The said company occupied desk space in the office of the Virginia, Tennessee & Georgia Air Line Association and hired for my assistance one man and a stenographer. My work consisted in supervising the solicitation of orders for the carriage of freight over this line solely within the states of Virginia, West Virginia, Maryland, North Carolina, Kentucky, and Ohio. The freight traffic managers of the Norfolk & Western Railway Company and of other railroad companies which have no railroad within the state of New York, and the freight managers of other companies which connected with them and have and operate railroads within the said state, together fixed or established through rates for the carriage of freight from points without to

points within the said state, and vice versa. The railroad which first received such freight by transportation was termed the 'initial road,' and it published such through rates, filed the same in accordance with the Interstate Commerce Act, and distributed them among shippers. My duties and the duties of my assistant were to interview shippers of freight that night pass over said Norfolk & Western Railway Company's said line of railroad and present to them the advantages, of shipping over that line, at the same time quoting them through rates on such freight. The shipper located within the state of New York would deliver the freight to the initial carrier in the said state and would receive from it a receipt for the goods to go to the desired destination. The Norfolk & Western Railway Company had no facilities of any kind for receiving or storing freight in said state and did not, in fact, receive any freight in said state. Said Norfolk & Western Railway Company did not give the shipper any receipt for the freight which was to move from within the said state and pass over its said line of railroad, but the Norfolk & Western Railway Company did give the shipper of freight originating on its said line of railroad and to go to a destination within the said state of New York a through bill of lading, and if the freight charge was prepaid said Norfolk & Western Railway Company received the full transportation charge and the same was later divided proportionately between the several carriers over whose lines said freight passed to its said destination. The freight charge on freight moving from a point within to a point without the state of New York if prepaid was paid to the initial road or steamship line or road or steamship line which first received the freight for transportation. If the shipment of such freight was made 'collect,' the freight charge was paid at the place of destination, and in either case such total freight charge was later divided proportionately between the several carriers over whose lines said freight passed to its said destination. Said Norfolk & Western Railway Company never collected freight charges within the state of New York, and its said employés had no authority to and did not, in fact, make any contract for said Norfolk & Western Railway Company. Neither I nor my assistant as soliciting agents had anything whatever to do with transportation over said Norfolk & Western Railway Company's line of railroad and had no authority and did not, in fact, approve of the freight charges of said company, nor did we come in contact with said freight. Bills against said Norfolk & Western Railway Company were paid by said company's checks, coming direct from its principal office in Roanoke, Va. The initial carrier or road which received the freight destined to go from a point within to a point without the state of New York and over said Norfolk & Western Railway Company's said line of railroad did not allow or pay the said company any refund for freight so shipped and which had been obtained by the soliciting agents within the state of New York for said Norfolk & Western Railway Company, and such initial carrier did not pay the Norfolk & Western Railway Company any portion of said soliciting agents' salaries, or of the rent of said Norfolk & Western Railway Company's desk space in the office of the 'Fast Freight Line' Association, or other expense incident to the maintenance of such soliciting agency. The only benefit which was derived by said Norfolk & Western Railway Company from the services of its said agents was its charges for transporting freight or passengers over its said line of railroad. Orders for the shipment of freight only over the Norfolk & Western Railway Line were not numerous. A negligible portion of my time was required in the supervision of the work.

"The Norfolk & Western Railway Company also formerly maintained an office at 1245 Broadway for the solicitation of passenger traffic over its line. On the door of this office, which consisted of one room, appeared the name 'Norfolk & Western Railway Company.' A couple of desks and chairs made up the equipment of the 'office.' The function of this passenger office was to furnish persons with information concerning rates and through sleeping car service and to solicit the carriage of passengers over the Norfolk & Western Lines. No tickets of any kind were sold by this office, except tickets for transportation on the Old Dominion Steamship Company's Lines, and, if an applicant wished a through rail ticket, the office bought the same from

the Pennsylvania or other lines connected with the Norfolk & Western. One man and an assistant were all that were needed to carry on the work of the office.

"On said 25th day of April, 1918, the Norfolk & Western Railway Company was carrying on no solicitation of freight orders within the city or state of New York. On or about the 15th day of December, 1917, in anticipation of the taking over of the railroads by the United States government, we discontinued our freight activities within New York state, both the solicitation for the Norfolk & Western Railway Company and for the Virginia, Tennessee & Georgia Air Line Association. The United States government took over the railroads at noon December 28, 1917, pursuant to a proclamation of the President, dated December 26, 1917.   *   *   *   At that time the work of winding up the freight soliciting business of the New York office of the association and of the Norfolk & Western Road was in progress."

In Mr. Stevenson's affidavit it is further stated that under date of March 30, 1918, the United States Director General of Railroads issued circular No. 17, the effect of which was, among other things, to close offices maintained for the solicitation of off-line business. Defendant company on April 29, 1918, issued an order effective April 30, 1918, closing its off-line freight and passenger offices in New York City and state. Mr. Stevenson further sets forth:

"I myself, at the time the plaintiff above named delivered the said papers to me, was engaged on the 25th day of April, 1918, exclusively in the work incident to winding up the affairs of the said office of the association and of the Norfolk & Western Railway Company, and five days thereafter both the freight and passenger offices of the Norfolk & Western Railway Company were physically closed, pursuant to the order above referred to. The passenger office continued operations until said order became effective on April 30, 1918, but solicitation had ceased and its activities consisted in furnishing the public, as was formerly done as part of the good will of soliciting, with information concerning rates and through service over the Norfolk & Western Line, and no solicitation of passenger traffic was being carried on at the date the summons and complaint were left with me. The office equipment, furniture, etc., of the freight offices of the association and of the Norfolk & Western Railway Company have been sold and the offices have been closed since April 30, 1918. Excepting as above stated, nothing was being done by the Norfolk & Western Railway Company in the state of New York on said 25th day of April, 1918, to the best of my knowledge, information, and belief."

Other affidavits are submitted substantiating Mr. Stevenson's affidavit in respect of various essential features.

Arthur H. Masten, of New York City, Stanley M. Moffat, of Yonkers, N. Y., and Theodore W. Reath, of Philadelphia, Pa. (E. Henry Lacombe, of New York City, of counsel), for the motion.

Hovell, McChesney & Clarkson, of Brooklyn, N. Y. (Sidney A. Clarkson, of Brooklyn, N. Y., of counsel), opposed.

MAYER, District Judge (after stating the facts as above). It is unnecessary to consider several points raised by both parties because the motion can be disposed of by determining whether or not defendant was, on April 25, 1918, doing business within the state of New York, in the sense which would subject it to the jurisdiction of this court.

[1] Although the cause was originally brought in the New York Supreme Court and removed here, it is now settled that all jurisdictional objections may be made in this court after removal. Mechanical Appliance Co. v. Castleman, 215 U. S. 437, 30 Sup. Ct. 125, 54 L. Ed. 272; Toledo Railways, etc., Co. v. Hill, 244 U. S. 49, 37 Sup. Ct. 591, 61 L. Ed. 982.

[2, 3] From the affidavits presented it seems to me that whatever in the way of "doing business" had theretofore gone on had ceased on April 25, 1918, as the result of the taking over of the railroads by the government. It may be well, however, to consider, in addition, whether the acts of defendant constituted the much mooted "doing business." The solution of this question depends practically upon the consideration of the meaning and effect of a limited number of leading cases. The facts in this case seem to come within the doctrine of Green v. Chicago, Burlington & Quincy Ry. Co., 205 U. S. 530, 27 Sup. Ct. 595, 51 L. Ed. 916, which decision seems recently to have been reaffirmed in principle in Enterprise, etc., Railway Equipment Co. v. Norfolk & Western Ry. Co., 245 U. S. 631, 38 Sup. Ct. 64, 62 L. Ed. ——. In St. Louis Southwestern Ry. Co. v. Alexander, 227 U. S. 218, 33 Sup. Ct. 245, 57 L. Ed. 486, Ann. Cas. 1915B, 77, the railway company did certain additional things, such as attending to claims presented for settlement and negotiating in respect thereof, and in such case the court held that the company was doing business, stating:

"Here, then, was an authorized agent attending to this and presumably other matters of a kindred character, undertaking to act for and represent the company, negotiating for it and in its behalf declining to adjust the claim made against it. In this situation we think this was the transaction of business in behalf of the company by its authorized agent in such manner as to bring it within the district of New York, in which it was sued, and to make it subject to the service of process there."

No such situation is here presented, and, as pointed out in St. Louis Southwestern Ry. Co. v. Alexander, supra, it is the duty of the court to decide each case upon its own facts.

In International Harvester Co. v. Kentucky, 234 U. S. 579, 34 Sup. Ct. 944, 58 L. Ed. 1479, the International Harvester Co. so handled its business that there was a continuous course of shipment of the harvester company's machines into Kentucky. In other words, as the result of solicitation of business and method of business, the court was satisfied that the presence of the corporation within Kentucky necessary to the service of process was shown, "when it appears that the corporation is there carrying on business in such sense as to manifest its presence within the state, although the business transacted may be entirely interstate in its character."

The court nevertheless regarded the question involved as a close one. It distinguished the International Harvester Co. Case from the Green Case, supra, reiterating, "we have no desire to depart from that decision which," the court added, "was an extreme case." The court also said, "In the case now under consideration, there was something more than mere solicitation."

In Tauza v. Susquehanna Coal Co., 220 N. Y. 259, 115 N. E. 915, the facts were in substance the same as in the International Harvester Co. Case, and, after a careful and learned review, the court held that service upon the defendant foreign corporation was good.

In the case at bar, however, there are no such facts as were presented in the International Harvester Co. and Tauza Cases, and the facts seem to be well within the principle of the Green Case. While, perhaps, the question is close, I conclude that this court is without jurisdiction, and therefore that the motion should be granted.